**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Eastern Division**

Case No.:  22-cv-6497

EMILY GLASPIE, on behalf of herself
and all others similarly situated,

        Plaintiff,                                  **CLASS ACTION**

v.

NATIONAL ASSOCIATION OF BOARDS
OF PHARMACY,

        Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiff, Emily Glaspie ("Plaintiff"), on behalf of herself and all others similarly situated, by and through the undersigned counsel of record, for her Complaint against Defendant, National Association of Boards of Pharmacy ("Defendant" or "NABP") states as follows:

### INTRODUCTION

1.     This is a case brought on behalf of young women and men who worked their whole lives to become registered/licensed pharmacists.[1]  Individuals who pursued years of undergraduate studies followed by four years of graduate studies to receive their doctor of pharmacy degree. Individuals who had only one thing standing between them and their career goals:  The North American Pharmacist Licensure Examination (the "NAPLEX"), which was administered by Defendant, the NABP.  These young women and men worked tirelessly to secure jobs and

_____

[1] Some states continue to call it a pharmacist registration while others call it a pharmacist license, while others still refer to it as the licensure of registered pharmacists.  For ease of this Complaint, it is referred to as a licensed pharmacist but encompasses both licensure and registration, as appropriate.

residencies that were contingent upon passing the NAPLEX—and unbeknownst to them, they had passed!

2.      But, instead of receiving some of the most wonderful news of their lives, Defendant NAPB gave these hard-working individuals some of the worst news they would ever receive:  That they **failed** the NAPLEX.

3.      For these individuals, the heart-dropping horror of seeing a failing score cannot be sufficiently described on paper.  This was the culmination of their academic careers and the last step before their professional careers.  For lawyers, it is the bar examination.  For medical doctors, it is the United States Medical Licensing Examination.  And, for licensed pharmacists, it is the NAPLEX.

4.      Like lawyers and medical doctors, many pharmacist candidates have already secured jobs contingent upon passing the NAPLEX before they even sit for the exam.  A passing score often confirms a job contract, residency, or other opportunity.  A failing score, however, leads not only to trauma and distress, but also to demotions or even a rescinded job offers or residencies.  That said, the trauma and distress that came with being told that they had failed cannot be understated.

5.      And that is exactly what happened to Plaintiff and the putative class.  In place of the "Pass" result that they had earned, simply appeared the word "Fail."  Defendant NABP reported that Plaintiff and hundreds of others failed the NAPLEX, when they had not.

6.      Because of Defendant's negligence in scoring and producing the NAPLEX, Plaintiff—along with hundreds of others—were subject to the embarrassment, stress, pressure, and negative connotations associated with failing the exam.  And, this was all because NABP scored Plaintiff's exam incorrectly and gave Plaintiff the wrong result.

7.     Even worse, NABP had knowledge of the NAPLEX scoring issues because the exact same thing happened to over 400 students in 2021.

**PARTIES, JURISDICTION, AND VENUE**

8.     This is an action against Defendant for actual damages in excess of $5,000,000.00 exclusive of interest, attorneys' fees, and costs.

9.     Plaintiff Emily Glaspie is a resident of the state of Texas, who is over the age of eighteen (18) and is otherwise *sui juris*.  Plaintiff brings this action individually and on behalf of a putative class of approximately 600 individuals who took the NAPLEX between August 31, 2021, and September 8, 2021, and between July 30, 2022, and October 26, 2022, and whose test results were incorrectly scored and negligently reported by Defendant NABP.

10.     Defendant NABP is an organization organized and existing under the laws of the Commonwealth of Kentucky, registered to do business in the State of Illinois as a foreign corporation, with its principal place of business in Cook County, Illinois.  Therefore, the NABP is deemed to be a citizen of Kentucky and Illinois for purposes of determining diversity of citizenship.

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that it is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of attorneys' fees, interests, and costs.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(d) in that it is a proposed class action where the amount in controversy exceeds $5,000,000, exclusive of interest and costs, that the putative class is at least 100 class members, as set forth herein, and at least one member of the putative class (indeed, Plaintiff) is diverse in citizenship from Defendant.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as Defendant's principal place of business is located in Cook County, Illinois.

14.     All conditions precedent to bringing the instant action have occurred, been performed, and/or have otherwise been excused, satisfied, or waived.

### THE GRUELING ROAD TO BECOMING A PHARMACIST

15.     Becoming a pharmacist is no easy accomplishment.

16.     Candidates must first attend a four-year institution and major in a field like biology, chemistry, biochemistry, or medicinal chemistry.

17.     Candidates must then take the Pharmacy College Admission Test (PCAT) and apply to a pharmacy school accredited by the Accreditation Council for Pharmacy Education to earn a doctoral degree ("PharmD").

18.     Pharmacy candidates must also complete a formal internship/residency program and experiential learning in pharmacy practice settings.  These programs are extremely competitive and prestigious.

19.     Aspiring pharmacists need to take two licensure exams and satisfy any prerequisite requirement set out by the state in which they choose to practice.

20.     The first such licensing exam is called the Multistate Pharmacy Jurisprudence Examination ("MPJE").  The second such licensing exam is the subject of this Complaint: the NAPLEX.

#### A.  The National Association of Boards of Pharmacy

21.     The National Association of Boards of Pharmacy is an organization founded in 1904.  The NABP was initially established to assist the state boards of pharmacy in creating uniform education and licensure standards.

22.     Now, the NABP develops, implements, and administers the NAPLEX and its protocols and procedures.

**B. The North American Pharmacist Licensure Examination**

23.     The NAPLEX is a standardized, computer-based exam developed by the NABP to assist state boards of pharmacy in evaluating a candidate's pharmacy skills and knowledge for licensure as a pharmacist in the United States.   Passing the NAPLEX is one of the many challenging steps required to become a licensed pharmacist.

24.     The NAPLEX consists of 225 multiple choice questions on three fundamental areas of competence: managing drug therapy, safely and accurately preparing and dispensing medications, and providing drug information and promoting public health.   Test takers have approximately six (6) hours to complete the NAPLEX.

25.     In order to take the NAPLEX, individuals educated in the United States must first apply for exam eligibility and pay a $100 application fee to NABP, submit transcripts, purchase the exam for $475, and schedule a date with a testing center.

26.     The NAPLEX can also be taken by foreign-educated pharmacists who have earned the Foreign Pharmacy Graduate Examination Committee Certification.

27.     The NAPLEX can be taken at any Pearson Vue Testing Center across the country and can be taken at any time throughout the year.

28.     Historically, the results of the NAPLEX were reported to test takers on a numerical scale, requiring a scaled score of 75 to pass.

29.     As of January 2021, however, NAPLEX changed its procedures, and results are now simply reported as "Pass" or "Fail," with no numerical score provided.

30.     At the same time as the NAPLEX results are posted to the test taker's NABP account, NABP automatically releases the results to the board of pharmacy designated on the test taker's NAPLEX application and to any additional jurisdiction that the test taker indicated on his or her application.

31.     Candidates are allowed only five (5) attempts to pass the NAPLEX, and there is a forty-five (45) day waiting period after a failed attempt to re-take the NAPLEX.  Students have to pay the $475 fee every time they take the NAPLEX.  Candidates pay this $475 fee and aforementioned $100 fee in exchange for Defendant's administration and *proper scoring* of the exam.

32.     Without a passing score on the NAPLEX, candidates cannot become a licensed pharmacist and, thus, cannot obtain employment as a pharmacist.

<u>FACTUAL ALLEGATIONS</u>

33.     After passing the MPJE in July of 2022, there was only one thing standing in Plaintiff's way of becoming the pharmacist she had always dreamed to be: the NAPLEX.

34.     Plaintiff received her PharmD and began studying for the NAPLEX right away.

35.     Plaintiff scheduled her NAPLEX exam at the testing center in Tyler, Texas, for August 9, 2022.

36.     By the time that the test date arrived, Plaintiff was as prepared as she could be.  She was confident that her hard work would result in a passing NAPLEX score.

37.     And that hard work did, in fact, payoff, as Plaintiff earned enough points to receive a passing NAPLEX score.

38.     But, shockingly, NABP did not release a passing score for Plaintiff.  Instead, NABP failed to identify errors in its scoring procedures and released a failing NAPLEX score for Plaintiff when she had really passed.

39.     Plaintiff trusted and reasonably relied on the organization designed to administer the NAPLEX to be competent enough to release the correct scores and therefore believed that she had failed.  As a direct result of her failing score, Plaintiff lost her intern's license, she lost the ability to work her full-time job, she lost her part-time job, and she suffered severe emotional distress.

40.     For two (2) months Plaintiff was led to believe she failed where she had passed. For two (2) months Plaintiff was paid markedly less money than she would have been but for Defendant's wrongdoing.  Then (two months later) Plaintiff learned that NABP had been negligent in its scoring duties and that Plaintiff had actually passed the NAPLEX.

**A.  NABP's Scoring Procedures**

41.     NABP expressly and impliedly represented to the public that it had procedures in place to ensure correct scoring of the NAPLEX and to ensure that, if scoring errors did occur, they would be detected promptly and would not reoccur.

42.     In NABP's 2022 Candidate Application Bulletin (the "Bulletin"), under the heading of "Rescore Process," NABP ironically states: "A highly rigorous process is used to ensure the accuracy of examination results, including a parallel scoring method involving independent scoring systems.  Therefore, it is highly unlikely that your exam results will be changed as a result of the rescore process."  A true and correct copy of the relevant portion of the Bulletin is attached as **Exhibit A**, at page 4.

43. Despite such statements, NABP has publicly admitted to incorrectly scoring and reporting NAPLEX results on multiple occasions.

**B. NABP's Express Warranties Created a Contract with Test Takers**

44. As a precondition to taking the NAPLEX, NABP requires each test taker to create an NABP account and to pay certain application fees. Unless the test taker creates an account and pays the fees, the test taker cannot take the exam. No test taker could refuse and contract with another party to administer and score the NAPLEX, as no other alternative testing service exists.

45. On NABP's website, under the heading of "Exam Results," NABP states "you will receive Pass or Fail exam results approximately seven business days after you have taken the exam." A true and correct PDF of NABP's website available at https://nabp.pharmacy/programs/examinations/naplex/ is attached hereto as **Exhibit B**, at 3.

46. This statement creates a contract between NABP and test takers, whereby NABP promises to provide test takers with the proper exam result.

47. These contracts between NABP and each member of the Class, including Plaintiff, are identical.

48. The contracts were dictated by NABP. Plaintiff and Class members had no bargaining power to negotiate any of the terms of the contracts or NABP's duties or obligations.

**C. Pharmageddon**

49. NABP started its own crisis when it failed to identify scoring errors for over 600 test takers and negligently published incorrect failing results for each of them. There is no doubt that the results of NABP's actions were catastrophic on the professional reputation and mental health of those effected.

a. **Pharmageddon 2021**

50.     In 2021, after the implementation of the new scoring method, NABP published incorrect NAPLEX results for the first (but not the last) time.

51.     Specifically, more than 400 students received the entirely incorrect NAPLEX result. Some received a failing result but, in fact, passed and some received a passing result but, in fact, failed.

52.     Weeks after the erroneous scoring occurred, NABP admitted to incorrectly scoring the exams. At that point, the effected test takers had already lost coveted jobs and residencies due to the false failing results that NABP reported.

53.     On September 21, 2021, NABP sent letters (the "2021 Letter") that read, in pertinent part:

> I want to make you aware that [NABP] has conducted a review of scores by candidates who recently took the [NAPLEX]. NABP found that approximately 430 candidates who took the NAPLEX between August 31, 2021, and September 8, 2021, received incorrect results. Approximately 410 candidates were originally informed that they had failed the NAPLEX when they had, in fact, passed and about 20 candidates were originally notified that they had passed the NAPLEX when they had, in fact, failed.
>
> --
>
> Through our internal review process, we have determined that a recent system update affected our scoring process and cause some exams to be wrongly scored.

A true and correct copy of the 2021 Letter is attached hereto as **Exhibit C**.

54.     The 2021 Letter further stated, in no uncertain terms, "To prevent this sort of situation from reoccurring, we have put into place additional system enhancements and scoring verification measures." *See* Exhibit C at 1. Unfortunately, this would not be the last of the NAPLEX scoring blunders.

55. As a result of NABP's erroneous score reports, the affected test takers in the proposed class lost jobs or residencies, suffered reputational damage, and missed out on lucrative pharmacist salaries.

### b. Pharmpocalypse 2022

56. Despite NABP's promises, yet another group of test takers, including Plaintiff, was subject to the same parade of horribles directly caused by NABP's incorrect scoring.

57. To reiterate, Defendant NABP was aware of the issues with its scoring procedures as indicated by Pharmageddon 2021 and the 2021 Letter but entirely failed to correct the issues. NABP's inability to fix such measures resulted in hundreds of additional incorrectly scored NAPLEX results and hundreds of lost jobs, decreased salaries, and emotional challenges.

58. Even worse, it took NABP approximately two (2) months to inform test takers of its error, more than one month longer than it took NABP to inform test takers of the 2021 error.

59. Plaintiff took the NAPLEX on August 9, 2022.

60. By the time that Plaintiff took the NAPLEX, she had already secured both a full-time job as a licensed pharmacist at Cardinal Health and a part-time job as a licensed pharmacist at University of Texas Health Athens. Importantly, both jobs were contingent upon passing the NAPLEX. Plaintiff intended to work both jobs.

61. Plaintiff was to be paid fifty-two dollars ($52.00) per hour as a full-time pharmacist at Cardinal Health.

62. Plaintiff also had a second, part-time, job where she was to be paid a substantial hourly rate as a part-time pharmacist at University of Texas Health Athens.

63. On August 16, 2022, Plaintiff was informed that she failed the NAPLEX.

64. As a result, Plaintiff was unable to obtain employment as a pharmacist.

65.    In fact, Plaintiff's part-time job offer was completely rescinded as a result of her false failing score.

66.    Although Plaintiff's full-time job offer was not entirely rescinded, she was unable to work because her intern license was revoked as a result of her failing score. Had Defendant not negligently reported Plaintiff's score as "failed" when she, in fact, passed, Plaintiff's intern license would not have been revoked, and she would have been making fifty-two dollars an hour ($52.00/hr) for a full-time position.

67.    On November 8, 2022, almost two (2) months after she took the NAPLEX, Plaintiff learned that NABP had incorrectly scored her August 9, 2022, NAPLEX, and that she actually received a passing score, which would have made her eligible for employment as a licensed pharmacist.

68.    On November 8, 2022, NABP, once again, sent a dismissive letter to Plaintiff and others similar situated (the "2022 Letter"), stating:

> I am writing to let you know that the National Association of Boards of Pharmacy (NABP) recently reviewed all North American Pharmacist Licensure Examination (NAPLEX) tests taken between July 30, 2022 and October 26, 2022. **As a result of the review, we determined that your NAPLEX score was incorrectly calculated and a passing score has been issued.**

(emphasis in original). A copy of the 2022 Letter is attached hereto as **Exhibit D**.

69.    For the eighty-four (84) days between when Plaintiff received the incorrect score and when Plaintiff learned that she actually passed, she suffered both physical and emotional damages.

70.    As a result of the erroneous scoring, Plaintiff missed out on approximately $22,880.00 in pay from her job at Cardinal Health alone.

**D. Catastrophic Effects of the False Failing Results**

71.     Not only did the NABP report the erroneous score to test takers, but the NABP also produced the patently false scores to state licensing boards and pharmacy institutions across the country.  The reported scores did not properly or accurately depict Plaintiff and the proposed class members' actual scores, thus diminishing their professional standings and reputations.

72.     NABP's actions prevented Plaintiff and the members of the proposed class from receiving or timely receiving their professional credentials, and thus, prevented them from retaining or obtaining employment as licensed pharmacists.  For example, many lost coveted positions, many were denied employment, and many were demoted to lower paying or unpaid positions.  As a result, Plaintiff and members of the proposed class have been damaged.

73.     NABP's actions also caused Plaintiff and proposed class members to incur costs related to taking the NAPLEX on multiple occasions, including paying re-scoring fees, purchasing prep courses or study guides to assist in future tests, performing additional course work, and paying to retake the exam.  Some members of the class also lost wages as a result of taking time away from work so that they could prepare to retake the NAPLEX.

74.     Finally, given the devastating effects on their careers, Plaintiff and all proposed class members experienced personal injuries, including serious and severe emotional distress, mental anguish, embarrassment, aggravation, and humiliation as a result of NABP's actions.  Many members of the proposed class even sought the help of mental health professionals to help cope with the aftermath of their results.

## CLASS REPRESENTATION ALLEGATIONS

75.     Plaintiff brings this class action, pursuant to Fed. R. Civ. P. 23, individually and on

behalf of the class of similarly situated individuals (the "Class") defined as follows:

> All persons in the United States, the District of Columbia, Puerto Rico, Guam, and
> the U.S. Virgin Islands who took the NAPLEX test administered by NABP ("Test
> Taker") during the period of August 31, 2021, through September 8, 2021, and July
> 30, 2022, through October 26, 2022, to whom Defendant sent the 2022 Letter or
> similar correspondence informing the Test Taker that the Test Taker's NAPLEX
> score was incorrectly calculated and a correct passing score was issued.

Plaintiff reserves the right to amend or modify the Class definition in connection with a Motion

for Class Certification and/or as the result of discovery.

76.     **Class Exclusions**.  The following people are excluded from the Class: 1) any Judge

or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's

subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents

have a controlling interest and its current or former employees, officers, and directors; 3) persons

who properly execute and file a timely request for exclusion from the Class; 4) the legal

representatives, successors, or assigns or any such excluded persons; 5) Plaintiff's counsel and

Defendant's counsel; and 6) any person whom Defendant can prove through affirmative evidence

whose NAPLEX was properly scored.

77.     **Numerosity**.  Although Plaintiff does not know the exact size of the Class, because

said information is in the exclusive control of Defendant, it is evident that the Class is so numerous

that joinder of all members into one action is impracticable.  Based upon the nature and scope of

the conduct involved here, and the information available from Defendant's letters, Plaintiff states

that the approximate number in this Class is in excess of six hundred (600) putative members,

who are most likely geographically dispersed throughout the United States, Puerto Rico, Guam,

and the U.S. Virgin Islands. Indeed, the 2021 Letter references at least 410 class members and the 2022 Letter was sent to approximately 220 individuals.

78. **Typicality**. Plaintiff's claims are typical of the claims that would be asserted by the other members of the Class in that, in proving her claims, Plaintiff will simultaneously prove the claims of all Class members. Plaintiff and each Class member took the NAPLEX and received an incorrect score on the NAPLEX, causing damage to their professional career and/or reputation. Plaintiff's claims are typical of those of all members of the Class. Plaintiff and all members of the Class were damaged by the same conduct of Defendants as complained of herein.

79. **Commonality**. Plaintiff's and Class members' claims raise predominantly factual and legal questions that can be answered for all Class members through a single class-wide proceeding. Questions of law and fact arising out of Defendant's conduct are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Classes. For example, it will be necessary to answer the following questions, each of which can be answered through common, generalized evidence:

    a.  Whether NABP improperly scored NAPLEX;

    b.  Whether NABP provided Plaintiff and Class members with erroneous failing test scores;

    c.  Whether NABP breached contracts with Plaintiff and Class members;

    d.  Whether NABP owed duties to Plaintiff and Class members which were independent of any of its contractual duties;

    e.  Whether NABP was negligent;

    f.  Whether NABP timely discovered its errors;

    g.  Whether NABP timely reported its errors;

h. Whether NABP informed Plaintiff and Class members of its scoring errors in a timely fashion;

i. What measures NABP took to determine and identify all those whose scores were impacted by the scoring errors; and

j. Whether NABP is legally liable for damages to Plaintiff and Class members.

80. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class that she seeks to represent because it is in her best interests to prosecute the claims alleged to obtain full redress due to her for the illegal conduct of which she complains. Her interests do not conflict with the interests of the respective Class because one or more questions of law and/or fact regarding liability are common to all Class members and by prevailing on her own claims, Plaintiff necessarily will establish liability to other Class members. Plaintiff will fairly and adequately represent the interests of the Class and has no interests that are antagonistic to the interests of the Class members. Plaintiff has retained counsel experienced in class action litigation and complex civil litigation to prosecute this action on behalf of the Class.

81. **Superiority.** A class action is superior to all other methods for the fair and efficient adjudication of the controversy, given that common questions of law and fact predominate over any individual questions that may arise, and significant economies or time, effort, and expense will inure to the benefit of the Court and the parties in litigating the common issues on a class-wide basis instead of a respective individual basis. Many Class members' individual damage claims are too small to make individual litigation an economically viable alternative, and few Class members have an interest in individually controlling the prosecution of a separate action. Despite the relatively small size of many individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common

basis, will enable this case to be litigated as a Class action on a cost-effective basis, especially when compared with respective individual litigation. Given the size of individual Class members' claims, few Class members could afford to seek legal redress individually for the wrongs Defendant committed against them. When the liability of Defendant is adjudicated, claims of all members of the Class can be determined by the Court. This action will facilitate the orderly and expeditious administration of the Class members' claims, economies of time, effort, and expense will be fostered and uniformity of outcome will be ensured. Without a class action, Class members will continue to suffer damages and Defendant's negligence will proceed without remedy. And no unusual difficulties are likely to be encountered in the management of this class action. The forum is desirable because Defendant's principal place of business is located in Cook County, Illinois.

82. **Ascertainability.** Members of the Class can be identified, and Class membership ascertained objectively through Defendant's records. Indeed, each class member has already been specifically identified by Defendant. Since registration with the NABP is a prerequisite to taking the NAPLEX, Defendant has contact information for every member of the Class.

83. Upon application by Plaintiff's counsel for certification of the Class, the Court may also be requested to utilize and certify subclasses in the interest of ascertain ability, manageability, justice and/or judicial economy.

84. Plaintiff satisfies the numerosity, commonality, typicality, and adequacy prerequisites for suing as a representative party pursuant to Fed. R. Civ. P. 23(a) and (b).

COUNT I
BREACH OF CONTRACT
(On Behalf of Plaintiff and the Class)

85.     Plaintiff reaffirms, realleges, and incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

86.     By submitting applications and fees to NABP in connection with taking the NAPLEX, Plaintiff and all Class members entered into implicit contracts with NABP based on NABP's representations on its website.

87.     These contracts contained express or implied provisions that NABP would correctly score the exams and provide test takers with the correct score.

88.     NABP breached its contracts when it incorrectly scored the NAPLEX taken by Plaintiff and the Class.

89.     Any attempt in NABP's contracts that purport to limit its duty to accurately and correctly score and report test grades, or to limit its liability in relation thereto, is unconscionable.

90.     Moreover, as the NABP is essentially granted a monopoly by the various pharmacy boards around the country, enforcing any attempt to limit NABP's liability would be tantamount to extending sovereign immunity to NABP in violation of public policy.

91.     Plaintiff and Class members performed their obligations under the contract.

92.     As a result of NABP's breach, Plaintiff and Class members suffered the damages as described herein.

93.     The damages suffered by Plaintiff and all Class members were the natural and foreseeable consequences of NABP's conduct.

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class, and against Defendant:

a.   Certifying the instant case as a class action pursuant to Fed. R. Civ. P. 23;

b.   Appointing Plaintiff as Class representative and the undersigned attorneys as Class counsel;

c.   Awarding Plaintiff and the Class damages;

d.   Awarding Plaintiff and the Class reasonable attorneys' fees and costs; and

e.   Awarding such further relief as the Court deems just and proper.

**COUNT II**
**NEGLIGENCE**
(On Behalf of Plaintiff and the Class)

94.   Plaintiff reaffirms, realleges, and incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

95.   NABP owed Plaintiff and all Class members duties, which it breached.

96.   As the administrator of the NAPLEX, NABP had a duty to Plaintiff and Class members to properly score the NAPLEX and to timely identify errors in scoring prior to the reporting of scores.

97.   NABP's actions were negligent, grossly negligent, flagrantly negligent, reckless, and malicious, rendering NABP liable for the following reasons:

a.   Failing to properly score the NAPLEX;

b.   Failing to discover scoring errors before reporting individual scores;

c.   Failing to timely implement effective audit or quality control procedures under which the examination scores were examined and determined to be accurate before reporting individual scores;

d.   Failing to implement appropriate procedures to prevent scoring errors and inaccuracies; and

    e.    Any and all other acts of negligence, recklessness, and omissions to be proven through discovery or at the time of trial of this matter, all of which are in contravention of the duties imposed by law in NABP in favor of Plaintiff and Class members.

98.    As a direct result of NABP's breach of its duties, Plaintiff and Class members suffered damages as described herein, including but not limited to decreased or diminished salaries/employment, emotional distress, and embarrassment.

99.    The damages suffered by Plaintiff and Class members were all general but special damages arising from the natural and foreseeable consequences of NABP's conduct.

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class, and against Defendant:

    a.    Certifying the instant case as a class action pursuant to Fed. R. Civ. P. 23;

    b.    Appointing Plaintiff as Class representative and the undersigned attorneys as Class counsel;

    c.    Awarding Plaintiff and the Class damages; and

    d.    Awarding such further relief as the Court deems just and proper.

### COUNT III
### NEGLIGENT MISREPRESENTATION
(On Behalf of Plaintiff and the Class)

100.    Plaintiff reaffirms, realleges, and incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

101.    NABP owed Plaintiff and all Class members a duty to accurately score the NAPLEX and provide test takers with correct results.

102.    NABP provided Plaintiff, Class members, and others with false information regarding their NAPLEX results.

103.    NABP did not use reasonable care in obtaining the results of the NAPLEX exam and ensuring such results were accurate before publishing them to the public.

104.    NABP negligently misrepresented to Plaintiff and Class members (and others) that Plaintiff and Class members had failed the NAPLEX when, in fact, they had passed.

105.    NABP also negligently misrepresented to the board of pharmacy and jurisdictions designated by Plaintiff and Class members as score recipients that Plaintiff and Class members had failed the NAPLEX when, in fact, they had passed.

106.    NABP also negligently misrepresented that it had procedures in place to ensure its correct scoring of the NAPLEX and to ensure that, if scoring errors occur, they would be detected promptly and would not reoccur.  *See* Exhibit C.

107.    NABP intended Plaintiff, Class members, and others to rely on the published NAPLEX results in determining Plaintiff and Class members' eligibility for a pharmacist licensure.

108.    Plaintiff and Class members relied on the false failing result when informing potential employers of such result.

109.    The board of pharmacy and any jurisdiction indicated by test takers relied on the false failing result when denying Plaintiff and Class members a pharmacist licensure.

110.    NABP represents to the public and to test takers that NAPLEX scores will be accurately reported.

111.    NABP breached its duty when it made the representations as referenced herein and failed to implement or use appropriate procedures to ensure the correct scoring and/or to prevent or detect scoring errors.

112.    Plaintiff and Class members justifiably relied on the incorrect results posted on their NABP account to their detriment.

113.    As a result of NABP's negligent misrepresentations, Plaintiff and Class members suffered damages as described herein.

114.    The damages suffered by Plaintiff and Class members are general and specific damages arising from the natural and foreseeable consequences of NABP's conduct.

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class, and against Defendant:

a.    Certifying the instant case as a class action pursuant to Fed. R. Civ. P. 23;

b.    Appointing Plaintiff as Class representative and the undersigned attorneys as Class counsel;

c.    Awarding Plaintiff and the Class damages; and

d.    Awarding such further relief as the Court deems just and proper.

### COUNT IV
### DEFAMATION PER SE
(On Behalf of Plaintiff and the Class)

115.    Plaintiff reaffirms, realleges, and incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

116.    NABP made a false statement about Plaintiff and Class members when it released a failing NAPLEX result when, in fact, Plaintiff and Class members had passed.

117.    Pursuant to NABP's procedures, NABP automatically releases NAPLEX scores to the board of pharmacy designated on test takers NAPLEX application.  If test takers selected additional jurisdictions for a score transfer, NABP also automatically sends scores to such jurisdictions.

118.    Accordingly, NABP made an unprivileged publication of the false results to various boards of pharmacy and jurisdictions.

119.    As a result of NABP's publication of Plaintiff and Class members' incorrect results, boards of pharmacy failed to issue licenses to Plaintiff and Class members.

120.    As a direct result of NABP's unprivileged publication of false statement, Plaintiff and Class members suffered damages as described herein, including but not limited to decreased or diminished salaries/employment, emotional distress, and embarrassment.

121.    The damages suffered by Plaintiff and Class members were all general but special damages arising from the natural and foreseeable consequences of NABP's conduct.

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class, and against Defendant:

a.  Certifying the instant case as a class action pursuant to Fed. R. Civ. P. 23;

b.  Appointing Plaintiff as Class representative and the undersigned attorneys as Class counsel;

c.  Awarding Plaintiff and the Class damages; and

d.  Awarding such further relief as the Court deems just and proper.

## COUNT V
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## 815 Ill. 505/1, *et seq.*
(On Behalf of Plaintiff and the Class)

122.    Plaintiff reaffirms, realleges, and incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

123.    Plaintiff brings this cause of action on behalf of herself and the Class against Defendant.

124.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") states in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. 505/2.

125.    Plaintiff and the Class are "person[s]" as defined by the Act.  815 Ill. 505/1(c).

126.    NABP engaged in the service of administering and organizing NAPLEX for pharmacy candidates.  Such services constitute "trade" and "commerce" as defined by the Act. 815 Ill. 505/1(f).

127.    NABP engaged in a deceptive act or practice in the course of its service when it released incorrect NAPLEX scores for approximately 600 test takers.

128.    NABP intended that Plaintiff, Class members, and others rely on the released NAPLEX scores in determining a test taker's license eligibility.

129.    Plaintiff and the Class were misled and deceived by the incorrect NAPLEX results published by NABP.

130.    Plaintiff and the Class relied on NABP's express and implied representations that it would score the NAPLEX and report the scores accurately and that it had done so.

131.    Plaintiff and Class members who received failing scores relied on NABP's representations that they had failed the NAPLEX and were not eligible for a pharmacist licensure.

132.    Boards of pharmacy and other jurisdictions that received Plaintiff and Class members' false failing scores relied on NABP's representations that Plaintiff and Class members failed the NAPLEX and were not eligible for a pharmacist licensure and/or employment.

133.    Plaintiff and the Class were damaged by the incorrect NAPLEX results published by NABP as described herein.

134.    Plaintiff and Class members' damages were the proximate result of the incorrect NAPLEX results published by NABP.

135.    As a result of the damages suffered due to NABP's actions, Plaintiff and the Class are entitled to reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class, and against Defendant:

a.   Certifying the instant case as a class action pursuant to Fed. R. Civ. P. 23;

b.   Appointing Plaintiff as Class representative and the undersigned attorneys as Class counsel;

c.   Awarding Plaintiff and the Class damages pursuant to 815 Ill. 5/505-10a(a);

d.   Awarding the Illinois Class members attorneys' fees pursuant to 815 Ill. 5/505-10a(c); and

e.   Awarding such further relief as the Court deems just and proper.

<u>**J**URY **T**RIAL **R**EQUEST</u>

Plaintiff, individually, respectfully requests a jury trial on issues so triable.

Respectfully submitted this 19th day of November, 2022, by:

**ZEBERSKY PAYNE SHAW LEWENZ, LLP**
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, Florida 33301
Tel: (954) 989-6333
Facsimile: (954) 989-7781
zludens@zpllp.com;
jshaw@zpllp.com;
lpalen@zpllp.com
mlomastro@zpllp.com

By:   */s/ Zachary D. Ludens*
        ZACHARY D. LUDENS, ESQ.
        Fla. Bar No. 111620